## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF KENTUCKY
## SOUTHERN DIVISION
## LONDON

**CIVIL ACTION NO.** _____

**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**

**V.**

**REAL PROPERTY KNOWN AS 42646 MEADOWLARK
RIDGE, MURRIETA, CALIFORNIA, WITH ALL
IMPROVEMENTS AND APPURTENANCES THEREON**                **DEFENDANT**

## VERIFIED COMPLAINT FOR FORFEITURE IN REM

The Plaintiff, United States of America, hereby brings this complaint and alleges as

follows in accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritimes

Claims and Asset Forfeiture Actions and 18 U.S.C. §§ 983 and 985.

## NATURE OF THE ACTION

1.      This is a civil action in rem brought pursuant to 21 U.S.C. § 881(a)(6) for the

forfeiture of property furnished or intended to be furnished in exchange for controlled

substances, proceeds traceable to such an exchange, or property used or intended to be used to

facilitate violations of 21 U.S.C. §§ 841(a)(1) and/or 846; pursuant to 21 U.S.C. § 881(a)(7) for

the forfeiture of real property used, or intended to be used, to commit, or to facilitate the

commission of violations of 21 U.S.C. §§ 841(a)(1) and/or 846; and pursuant to 18 U.S.C. §

981(a)(1)(A) for the forfeiture of property involved in a conspiracy to commit money laundering

in violation of 18 U.S.C. § 1956(h).

**THE DEFENDANT IN REM**

2.      The Defendant is real property known as 42646 Meadowlark Ridge, Murrieta,

California, with APN 909-230-025-6, of record as Doc # 2017-0363412 in the Official Records

of the County of Riverside, and more particularly described as follows:

THE FOLLOWING LAND SITUATED IN THE CITY OF MURRIETA, COUNTY OF
RIVERSIDE, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

LOT 9, OF TRACT NO, 30172, IN THE CITY OF MURRIETA, COUNTY OF
RIVERSIDE, STATE OF CALIFORNIA, AS SHOWN BY MAP ON FILE IN BOOK
390, PAGES 53 THROUGH 59, INCLUSIVE OF MAPS, IN THE OFFICE OF THE
COUNTY RECORDER OF SAID COUNTY, EXCEPTING THEREFROM ALL OIL,
OIL RJGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS RIGHTS, AND
OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, GEOTHERMAL
STEAM AND ALL PRODUCTS DERIVED FROM ANY OF THE FOREGO!NG,
THAT MAY BE WITHIN OR UNDER THE PARCEL OF PROPERTY
HEREINABOVE DESCRIBED, TOGETHER WITH THE PERPETUAL RIGHT OF
DRILLING, MINING, EXPLORING AND OPERATING THEREFOR AND STORING
IN AND REMOVING THE SAME FROM SAID PROPERTY OR ANY OTHER
PROPERTY, INCLUDING THE RIGHT OF WH!PSTOCK OR DIRECTIONALLY
DRILL AND MINE FROM PROPERTIES OTHER THAN THOSE HEREINABOVE
DESCRIBED, OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH
OR ACROSS THE SUBSURFACE OF THE PROPERTY HEREINAFTER
DESCRIBED, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY
DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR
BEYOND THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, RETUNNEL,
EQUIP, MAINTAIN, REPAIR, DEEPEN, AND OPERATE ANY SUCH WELLS OR
MINES WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE, STORE, EXPLORE
OR OPERATE THROUGH THE SURFACE OR THE UPPER 500 FEET OF THE
SUBSURFACE OF THE PROPERTY HEREINABOVE DESCRIBED.

PARCEL 2:

NONEXCLUSIVE EASEMENTS FOR ACCESS, INGRESS, EGRESS, USE,
ENJOYMENT, DRAINAGE, ENCROACHMENT, SUPPORT, MAINTENANCE,
REPAIRS, AND FOR OTHER PURPOSES, ALL AS DESCRIBED IN THE
DECLARATION NOVEMBER 9, 2004, AS INSTRUMENT NO. 2004-8920026, OF
OFFICIAL RECORDS.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355(a).

4.      This Court has in rem jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b). Upon the filing of the Complaint, the defendant property will be posted by the United States Marshals Services, giving notice of this action and providing the Court with in rem jurisdiction over the property, pursuant to 18 U.S.C. § 985(c). All owners of the real property will be served in accordance with Supplemental Rule G(4). Pursuant to 18 U.S.C. § 985(c)(3) and Supplemental Rule G(3)(a), no arrest warrant in rem needs to be issued for the defendant property if the property is posted.

5.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1)(A) and 1395(a) because acts giving rise to the forfeiture occurred in this district.

## FACTS GIVING RISE TO FORFEITURE

6.      The Drug Enforcement Administration (DEA) has discovered an online vendor who employs the moniker "ResearchChems1" (and also the shortened name "RC1") and utilizes a "clearnet" website, an encrypted communication application, and advertising on the darknet forum "Dread" to sell counterfeit pills that it manufactures, including counterfeit alprazolam pills containing clonazolam and counterfeit Adderall pills containing methamphetamine, both of which are controlled substances. Other vendors on darknet marketplaces also have sold these RC1-manufactured counterfeit pills.

7.      The "darknet" is an anonymizing software or application used to access content and websites on the "dark web," a portion of the "Deep Web" of the Internet. The Deep Web is the portion of the Internet not indexed by search engines, e.g., databases and internal networks

belonging to private industries, government agencies, or academic institutions. Criminal marketplaces operate within the dark web, allowing individuals to buy and sell illegal items, such as drugs, firearms, and other hazardous materials, with greater anonymity than is possible on the traditional Internet, which is sometimes referred to as the "clear web" or simply the "web."

8.      Vendors sell goods and services on the dark web through the creation and operation of vendor accounts, and customers purchase these goods and services through the creation and operation of customer accounts. Vendor and customer accounts are identified by monikers or "handles," much like usernames one would use on the clear web. The same person can operate multiple vendor or customer accounts at the same time. Dark web vendors often have multiple monikers for different accounts to prevent law enforcement from attributing those accounts to the same person.

9.      There are multiple individuals located throughout the United States involved with the RC1 drug-trafficking organization (the "DTO"). Investigators have identified Justin Ash, a California resident currently residing at the defendant property, as the leader of the DTO.

10.     Investigators used a DEA Confidential Source ("CS") to establish and maintain communications with RC1 via an encrypted communications application, as well as to conduct undercover purchases of counterfeit pills from RC1. Eventually, DEA personnel took over the CS's dark web account, allowing it to effectively function as an undercover account.

11.     From around November 2024 through October 2025, the CS arranged several undercover purchases of RC1 counterfeit pills to be shipped to locations controlled by DEA in the Eastern District of Kentucky, including purchases for counterfeit alprazolam pills containing designer benzodiazepines, such as clonazolam, and counterfeit Adderall pills containing

4

methamphetamine, as confirmed by laboratory testing of the pills received from the DTO at the DEA-controlled locations.

12.     The CS made purchases from RC1 by sending Bitcoin ("BTC"), a type of cryptocurrency, from undercover wallets controlled by DEA investigators to a BTC address provided by RC1.

13.     In the course of discussing the prospect of working with the CS to supply counterfeit pills that the CS could sell to others, RC1 noted his experience and capabilities and then stated, "I used to be domesticRCs.com" and "This should give you an idea of my knowledge history."

14.     On or about January 16, 2020, Ash pled guilty to conspiring to violate 21 U.S.C.§§ 331(a), 333(a)(2), 352(b)(1), 352(f)(1), and 352(o), as set forth in an Information filed in the United States District Court for the Western District of Pennsylvania in Case No. 2:19-CR-368.  The Information stated that "ASH was associated with, and controlled directly and indirectly, an internet-based business entity, known variously as DRC or Domestic RCS" and described how Ash "obtained bulk supplies of clonazolam, diclazepam, flubromazolam, and etizolam from overseas sources, including from suppliers in China" and "caused his employees to press the substances into pills, package the pills, and ship the packages to customers throughout the United States." The Information further described how "ASH operated multiple email accounts in connection with DRC."

15.     The CS later told RC1 he had concerns because he saw "the doj release" when he did a Google search for "domesticrcs." In response, RC1 stated, "Its long and over with. They do not looks at me at all i have several legit businesses and all report. I keep myself very small out there but im known by the real people of the community require referrals to prevent jurisdiction a

d don't advertise hardly ever. I have 0 heat. Its been so many years now. The prosecution said they never chase a case like it again since its low punishment and high work load."

16.     RC1 made statements to the CS regarding his current production of counterfeit alprazolam. For example, on July 10, 2025, RC1 made the following statements to the CS: "Ya iv sold 500 boats this month / I barely keep up with that and my work / Ya and its only the 10th / I think ill be over 1000 this month easy." The CS informed investigators that "boat" refers to one thousand pills; therefore, RC1 was stating that he has sold 500,000 pills by the 10th of July and predicted his monthly output to be over a million pills.

17.     RC1 advertised price tiers for counterfeit alprazolam pills on his clearnet site. The tiers were based on the amount of pills purchased and ranged from $275 for 500 pills to $450 to $250 per 1000 pills for quantities ranging from 1,000 to 50,000 or more pills. At one point, RC1 informed the CS that he was "at 250 for 50k / 225 for 100k," meaning he was charging $250 per 1,000 pills for 50,000-99,999 pills and $225 per 1,000 pills for 100,000 or more pills.

18.     RC1 also provided the CS with price tiers for counterfeit Adderrall, which ranged from $800 to $600 per 1,000 pills for quantities ranging from 5,000 to 100,000 or more pills.

19.     Other evidence obtained as part of the investigation into the DTO corroborates Ash's involvement with RC1 and his participation in the production and distribution of counterfeit alprazolam and counterfeit Adderall pills. In particular, investigators have obtained from online accounts associated with Ash multiple images of suspected counterfeit alprazolam and Adderall pills and multiple communications in furtherance of the production of such pills.

20.     For example, a Google account associated with Ash contained a screenshot of a portion of a conversation in a messaging application in which someone complimented "how close they are to pharma," followed by a photograph of a hand holding two white in color

rectangular pills bearing the imprint, "G3722," which is consistent with the appearance and imprint of a generic alprazolam pill. RC1 responded, "Review it for me please on dread. And on other places I would appreciate it."

21.     As another example, the Google account associated with Ash also contained a "privnote" message that begins, "Hey RC1," and continues, "Order: 20g Etiz," and then provides what appears to be a BTC transaction ID, which is a unique reference for a BTC transaction, and a shipping address.

22.     Through surveillance of the defendant property and review of other evidence obtained as part of the investigation into the DTO, investigators determined that the DTO was using the defendant property in furtherance of its illegal enterprise.

23.     Ash has used the defendant property to procure necessary materials for pill pressing. For example, on February 13, 2025, an e-mail address associated with Ash was used to order FD&C Food Color, Yellow #5 from an online seller and provided the defendant property as the shipping address for the order. RC1 offers counterfeit alprazolam pills with the legitimate manufacturer's imprint of "R039," which is a yellow bar-shaped pill.

24.     In addition, on November 27, 2023, an e-mail address associated with Ash was used to order 50 kg of white Firmapress from an online seller and provided the defendant property as the shipping address for the order. Firmapress is a binder excipient product, which is an ingredient Ash used in the manufacturing of the RC1 counterfeit pills.

25.     From approximately January 2021 to August 2025, an Amazon account registered to Christina LaFlower, who is known to be Ash's significant other, placed orders for shipment to the defendant property for different pigment powders (Green Neon, Blue Neon, Orange Neon,

FD&C Yellow #5 and #6), microcrystalline cellulose powder (which is a binder excipient), and a heavy-duty digital shipping scale.

26.    In addition to selling yellow R039 pills, RC1 sent pictures of his other counterfeit pill products to the CS, including counterfeit alprazolam pills that are green and stamped with the legitimate manufacturer's imprint "S903," counterfeit alprazolam pills that are blue and stamped with the legitimate manufacturer's "B707," and counterfeit Adderall pills that are orange and stamped with the legitimate manufacturer's imprint "b974."

27.    The items ordered from Amazon by LaFlower's account are necessary ingredients for pressing counterfeit pills or are useful in the processing of a large number of postal packages as would be expected from a large-scale darknet distributor like RC1. There were more than twenty orders of this type during this time frame, revealing a consistent pattern of utilizing the defendant property in furtherance of the DTO's illegal enterprise.

28.    Investigators also have determined that funds obtained from the DTO's drug trafficking have been used to pay for the purchase and maintenance of the defendant property.

29.    Shawn Wright, a resident of Virginia, has been identified as an individual involved with handling funds received by the DTO in exchange for controlled substances.

30.    Ash repeatedly has sent cryptocurrency proceeds of the RC1 drug trafficking to Wright in exchange for fiat currency. Because of their nature, darknet criminal operations typically are highly dependent on the movement of illicit cryptocurrency proceeds in exchange for fiat currency.

31.    Wright also has paid Ash's bills (including multiple payments on the mortgage secured by the defendant property) in exchange for illicit cryptocurrency proceeds from the RC1 operation transferred to Wright by Ash or one of Ash's co-conspirators.

8

32.     Wright started conducting these transactions at least as early as 2019 and has continued to do so through 2025.

33.     On or about November 4, 2025, law enforcement executed searches of the defendant property and of another site in California, which is known to be the site used for pressing pills, pursuant to lawfully issued warrants.

34.     As a result of the search of the defendant property, DEA seized approximately 1,000 pounds of binder from the attached garage of the residence and one bag of green dye from inside the residence.

35.     As a result of the search of the pill-pressing site, DEA seized pill-pressing equipment, a white glass-like substance believed to be methamphetamine, and a large number of counterfeit alprazolam pills, among other evidence.

36.     Investigators interviewed Ash at the time of the search. Ash acknowledged his involvement with the DTO and indicated that he kept materials for the pill pressing operation at the defendant property.

37.     Ash also indicated during his interview that the income he receives from drug trafficking allows him to pay his bills. While he also operates other legitimate businesses, Ash stated that those businesses were not profitable.

## LEGAL BASIS FOR FORFEITURE

38.     The defendant property is subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) because it represents property traceable to funds furnished or intended to be furnished in exchange for controlled substances or property used or intended to be used to facilitate violations of 21 U.S.C. §§ 841(a)(1) and/or 846; pursuant to 21 U.S.C. § 881(a)(7) because it is real property that was used, or intended to be used, to commit, or to facilitate the

commission of violations of 21 U.S.C. §§ 841(a)(1) and/or 846; and pursuant to 18 U.S.C. § 981(a)(1)(A) because it was involved in a conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

WHEREFORE, the United States respectfully requests that the real property be forfeited and condemned to the United States for disposition in accordance with the law and that the United States be granted such other relief as this Court may deem just and proper, including but not limited to the costs of this action.

PAUL C. McCAFFREY
FIRST ASSISTANT UNITED STATES ATTORNEY

By:    /s/ Haley Trogdlen McCauley
       Assistant United States Attorney
       260 West Vine Street, Suite 300
       Lexington, Kentucky 40507
       Phone: (859) 685-4831
       Fax: (859) 233-2533
       haley.mccauley@usdoj.gov